**Esther KATZ, Plaintiff,**

v.

**MCI TELECOMMUNICATIONS CORPORATION,
Defendant.**

**No. 98–CV–0812 (FB).**

United States District Court,
E.D. New York.

Aug. 4, 1998.

Jeffrey M. Katz, Forest Hills, New York City, for Plaintiff.

Stephen R. Reynolds, Gibbons, Del Deo, Dolan, Griffinger & Vecchione, New York City, for Defendant.

## *MEMORANDUM AND ORDER*

BLOCK, District Judge.

Plaintiff Esther Katz ("Katz") alleges that a telemarketer employed by defendant MCI Telecommunications Corporation ("MCI") misrepresented certain features of its resi-

dential telephone account program to her, inducing her to switch her service from another company, and ultimately causing her to develop "a phobia by which she mistrusts all telemarketers, whom she now believes are all fraudulent and not bona fide offerors of the services or products they purport to offer." Complaint at ¶ 20. She seeks $10 million in compensatory and $40 million in punitive damages. MCI moves to dismiss the complaint for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Despite the Court's concern that the everyday residential consumer is easy prey for telecommunications carriers soliciting new customers, it is constrained by applicable authority to conclude that Katz does not have a judicial remedy against MCI on the facts as pled here. Accordingly, the motion is granted and the complaint dismissed.

## BACKGROUND

The facts are relatively straightforward. According to the allegations of the complaint, which the Court must take as true for purposes of this motion to dismiss, *see Albright v. Oliver*, 510 U.S. 266, 268, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994), on or about March 3, 1997, Katz, a resident of Forest Hills, Queens, was contacted by Brian Soncrant ("Soncrant"), a sales associate employed by MCI. Soncrant represented to Katz that MCI had recently instituted a new residential telephone account program and that the terms of the program would not be changed during the lifetime of the customer. Soncrant also advised Katz that she would receive reduced fares on Continental and Delta Airlines if she enrolled in the program. Katz enrolled in the program on or about March 4, 1997. Katz alleges that these representations were false, and that they exacerbated her precarious physical condition, including her spastic colitis, and caused her mental suffering and anguish. She also alleges that she sustained $70 in damages because she purchased airline tickets at an amount higher than that represented to her by Soncrant. Her complaint, which was originally filed in

Supreme Court, Queens County, was subsequently removed to this Court by MCI based upon diversity of citizenship and federal question jurisdiction. 28 U.S.C. §§ 1331, 1332, 1337.[1] The complaint contains four state law claims: (1) fraudulent misrepresentation, which allegedly led Katz to develop telemarketer phobia; (2) tortious interference with contract; (3) intentional infliction of emotional distress; and (4) violation of New York General Business Law § 349.

In regard to its Rule 12(b)(6) motion to dismiss, MCI contends: (1) Katz's claims are barred by the filed rate doctrine; (2) any claim not barred by the filed rate doctrine is subject to the primary jurisdiction of the Federal Communications Commission ("FCC"); and (3) Katz's claim for intentional infliction of emotional distress is insufficient as a matter of New York law.

## DISCUSSION

### 1. Standard on a Motion to Dismiss

The Court's function in reviewing a motion to dismiss pursuant to Rule 12(b)(6) "is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Geisler v. Petrocelli*, 616 F.2d 636, 639 (2d Cir.1980); *Ricciuti v. New York City Transit Auth.*, 941 F.2d 119, 124 (2d Cir. 1991). A complaint will be dismissed "only if it appears that [the plaintiff] can prove no set of facts, consistent with [her] complaint, that would entitle [her] to relief." *Electronics Communications Corp. v. Toshiba America Consumer Prods., Inc.*, 129 F.3d 240, 242–43 (2d Cir.1997). "[I]n ruling on defendant's motion, the court must accept as true all the factual allegations in the complaint and must draw all reasonable inferences in favor of the plaintiff." *Hamilton Chapter of Alpha Delta Phi, Inc. v. Hamilton College*, 128 F.3d 59, 63 (2d Cir.1997). In reviewing the pleadings, the Court " 'must limit itself to facts stated in the complaint or in documents attached to the complaint as exhibits or incorporated in the complaint by reference.' " *Newman &*

---

1. Removal to this Court, while appropriate for reasons of diversity, would not otherwise be appropriate. *See Fax Telecommunicaciones, Inc. v.*

*AT & T*, 138 F.3d 479, 486 (2d Cir.1998); *Marcus v. AT&T Corp.*, 138 F.3d 46, 52 (2d Cir.1998).

*Schwartz v. Asplundh Tree Expert Co., Inc.,* 102 F.3d 660, 662 (2d Cir.1996) (quoting *Kramer v. Time Warner, Inc.,* 937 F.2d 767, 773 (2d Cir.1991)); *see also Kopec v.. Coughlin,* 922 F.2d 152, 155–56 (2d Cir.1991). Tariffs filed by telecommunications corporations are public records and may properly be considered in connection with a Rule 12(b)(6) motion to dismiss. *See Marcus v. American Tel. & Tel. Corp.,* 938 F.Supp. 1158, 1164–65 (S.D.N.Y.1996), *aff'd,* 138 F.3d 46.

## II. The Filed Rate Doctrine

■ MCI primarily bases its motion to dismiss upon the purported applicability of the "filed rate doctrine," which is also known as the "filed tariff doctrine." This doctrine arises out of the requirement in the Federal Communications Act that telecommunications service providers "file with the [Federal Communications] Commission and print and keep open for public inspection schedules showing all charges for itself and its connecting carriers ... showing the *classifications, practices, and regulations affecting such charges....* " 47 U.S.C. § 203(a) (emphasis added). The filed rate doctrine " 'forbids a regulated entity to charge rates for its services other than those properly filed with the appropriate federal regulatory authority.' " *Fax Telecommunicaciones,* 138 F.3d at 488 (quoting *Arkansas Louisiana Gas Co. v. Hall,* 453 U.S. 571, 577, 101 S.Ct. 2925, 69 L.Ed.2d 856 (1981)); *see also American Tel. & Tel. Corp. v. Central Office Tel., Inc.,* — U.S. ——, 118 S.Ct. 1956, 1962–63, 141 L.Ed.2d 222 (1998); *Marcus,* 138 F.3d at 58; *American Tel. & Tel. Co. v. City of New York,* 83 F.3d 549, 552 (2d Cir.1996). The doctrine has a two-fold purpose: to preserve the FCC's primary jurisdiction over the reasonableness of rates (the "nonjusticiability strand"); and to prevent utilities from discriminating among customers with regard to the rates they charge for their services (the "nondiscrimination strand"). *See Fax Telecommunicaciones,* 138 F.3d at 489; *Marcus,* 138 F.3d at 58.

■ The practical effect of the filed rate doctrine is to preclude customers from commencing a judicial action challenging a utility's failure to provide services at a rate other than that set forth in the published tariff. As the Second Circuit made clear in *Marcus:*

> Application of the filed rate doctrine in any particular case is not determined by the culpability of the defendant's conduct or the possibility of inequitable results..... Rather, the doctrine is applied strictly to prevent a plaintiff from bringing a cause of action even in the face of apparent inequities whenever either the nondiscrimination strand or the nonjusticiability strand of the doctrine is implicated by the cause of action the plaintiff seeks to pursue.

*Marcus,* 138 F.3d at 58–59; *see also Wegoland Ltd. v. NYNEX Corp.,* 27 F.3d 17, 18–19 (2d Cir.1994). Thus, the Second Circuit has specifically held that the filed rate doctrine bars an action for damages that is premised upon the utility's fraudulent misrepresentation regarding its rates. *Marcus,* 138 F.3d at 60–61. As the court noted in *Marcus,* an award of damages under such circumstances would implicate both the nondiscrimination and nonjusticiability strands of the filed rate doctrine:

> First, claims for compensatory relief 'undermine the congressional scheme of uniform rate regulation[] [because] [p]laintiffs who were able to prove their claims and recover damages would effectively receive a discounted rate for phone service over other ... customers.... Second, and just as important, an award of compensatory damages would violate the nonjusticiability strand of the doctrine.... [Plaintiffs] are correct that awarding these damages would not amount to judicial rate-making *per se.* However ... the filed rate doctrine prevents more than judicial rate-setting; it precludes any judicial action which undermines agency rate-making authority.'

*Id.* Accordingly, the Second Circuit in *Marcus,* in addition to dismissing plaintiffs' fraudulent misrepresentation claim, also dismissed all of their other state law damage claims, consisting of claims arising under §§ 349 and 350 of New York's General Business Law and a common law claim for negligent misrepresentation, because "any award of damages would ... implicate the nondiscrimination and nonjusticiability strands of the filed rate doctrine." *Id.* at 62.

The rationale behind the *Marcus* decision is fatal to Katz's claims. To the extent that Katz alleges that Soncrant misrepresented MCI's residential rates in order to induce her to switch her service, the complaint falls within the paradigm application of the filed rate doctrine as most recently articulated by the Second Circuit in *Marcus* and *Fax Telecommunicaciones, supra.* Although the Second Circuit has aptly observed that the notion that residential telephone customers are aware of the provisions of their carrier's tariffs is "little more than a legal myth," *Marcus*, 138 F.3d at 63, Katz's claim that MCI misrepresented its rates is nonetheless barred because, as a matter of law, she is presumed to have knowledge of the filed tariff rate, and, therefore, any reliance upon Soncrant's representations must be deemed not reasonable. *Marcus*, 138 F.3d at 64 ("A reasonable consumer may not rely on any statements by [the carrier] that contradict the terms of its filed tariff (whether caused by carelessness or an intent to defraud), because consumers are conclusively presumed to know the legal tariffs filed with the FCC."); *see also Fax Telecommunicaciones*, 138 F.3d at 490.

▮ Katz's claim that MCI tortiously interfered with her relationship with AT & T is wholly derivative of her claim that MCI did not offer the proposed rate, and is thus also barred. *See American Tel. & Tel. Co. v. Central Office Tel., Inc.*, —— U.S. at ——, 118 S.Ct. at 1964. However, Katz's claim that she did not receive the promised rates from Delta and Continental Airlines is somewhat different from her claim that Soncrant misrepresented *MCI's* rates for services under the tariff. To the extent that Katz alleges that these airlines did not honor their arrangement with MCI, her claim against MCI is barred by the tariff's limitation of liability provision, of which she is, under the rationale of *Marcus* and *Fax Telecommunicaciones*, also presumed to have knowledge. This provision clearly provides that "MCI shall not be liable for any act or omission of . . . a third party, including those vendors

participating in offerings made to customers under this tariff. . . ." *See* Certification of Patrick C. Dunican, Jr. ("Dunican Cert."), at. Exh. "B," Tab 1. Insofar as Katz claims that Soncrant fraudulently misrepresented the fares to which she would be entitled on Delta and Continental, this claim is barred by the filed rate doctrine because the damage remedy would give her an advantage over other customers, thereby implicating the nondiscrimination strand of the filed rate doctrine.

▮ The Court need not decide whether Katz's claim for intentional infliction of emotional distress is similarly barred by the filed rate doctrine, as it is insubstantial as a matter of New York law.[2] In New York, " '[l]iability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society.' " *Murphy v. American Home Prods. Corp.*, 58 N.Y.2d 293, 303, 448 N.E.2d 86, 90, 461 N.Y.S.2d 232, 236 (1983) (quoting Restatement (Second) of Torts § 46, subd. (1)); *see also Howell v. New York Post Co.*, 81 N.Y.2d 115, 121–22, 612 N.E.2d 699, 702, 596 N.Y.S.2d 350, 353 (1993); *Roach v. Stern*, —— A.D.2d ——, 675 N.Y.S.2d 133, 135 (2d Dept. 1998). "The element of outrageous conduct is 'rigorous and difficult to satisfy,' and its purpose is to filter out trivial complaints and assure that the claim of severe emotional distress is genuine." *Roach*, at 135 (quoting *Howell*, 81 N.Y.2d at 122, 612 N.E.2d at 702, 596 N.Y.S.2d at 353). Courts routinely determine the outrageousness of alleged conduct as a matter of law, and, as the Court of Appeals noted in *Howell*, "of the intentional infliction of emotional distress claims considered by this Court, every one has failed because the alleged conduct was not sufficiently outrageous." *Howell*, 81 N.Y.2d at 122, 612 N.E.2d at 702, 596 N.Y.S.2d at 353. Based upon the allegations of the complaint, the Court has no difficulty in concluding that the conduct alleged falls well short of that degree of "atrocious," "in-

---

**2.** It could be argued, with some force, that since this tort does not implicate agency rate-making authority or effect consumer price discrimination, neither the nonjusticiability nor the nondis- crimination strands of the filed rate doctrine would be affected by permitting such a claim to survive.

tolerable" conduct that will support a claim for intentional infliction of emotional distress under New York law.

█ Finally, the Court notes that the tariff does not limit MCI's liability for *willful* misconduct. *See* Dunican Cert. at Exh. "B," Tab 1 ("MCI's liability for willful misconduct, if established as a result of judicial or administrative proceedings, is not limited by this tariff."). The Second Circuit has defined "willful misconduct" as:

> the intentional performance of an act with knowledge that the performance of that act will probably result in injury or damage, or ... the intentional performance of an act in such a manner as to imply reckless disregard of the probable consequence ... [or] the intentional omission of some act, with knowledge that such omission will probably result in damage or injury, or the intentional omission of some act in a manner from which could be implied reckless disregard of the probable consequences of the omission....

*Berner v. British Commonwealth Pacific Airlines,* 346 F.2d 532, 536–37 (2d Cir.1965) (omissions in original); *see also Stand Buys, Ltd. v. Michigan Bell Telephone Co.,* 646 F.Supp. 36, 38 (E.D.Mich.1986). Katz's complaint does not contain allegations that MCI's conduct was willful, as defined by the Second Circuit in *Berner,* or that the "willful misconduct" clause of the tariff applies, although she does ask for punitive damages. However, in response to MCI's motion, Katz now maintains that MCI's conduct was willful and thus falls within the ambit of the willful misconduct clause. In any event, Katz's belated efforts to invoke the willful misconduct clause of the tariff are unavailing. As the Supreme Court recently noted, the willful misconduct clause cannot create a cause of action that is inconsistent with the dictates of the Communications Act. *Central Office Tel.,* —— U.S. at ——, 118 S.Ct. at 1965. "It is the Communications Act that renders the promise of preferences unenforceable. The tariff can no more exempt the broken promise of preference that is willful than it can the broken promise of preference that is uninten-

tional." *Id.* Indeed, prior to the Supreme Court's decision in *Central Office Telephone,* most courts that had considered the issue had held that the "willful misconduct" clause did not revive claims otherwise barred by the filed rate doctrine, *i.e.,* claims directly related to tariffed rates. *See, e.g., Marco Supply Co. v. AT & T,* 875 F.2d 434, 436 (4th Cir.1989) (willful misconduct clause does not except misrepresentation claims from the operation of the filed rate doctrine); *International Tel. Ctr., Inc. v. American Tel. & Tel. Co.,* 1997 WL 599618, at *5 (E.D.La. Sept.16, 1997) (rejecting willful misconduct defense where plaintiff alleged that AT & T "purposely" quoted it a rate different from that contained in the tariff); *Multi Communication Media Inc. v. AT&T Corp.,* 1997 WL 188938, at *11 (S.D.N.Y. Apr.18, 1997) ("Any action for or defense of a willful misconduct would have the same effect as a fraud action, *i.e.,* it would require the court to inquire into the reasonableness of the rates and any damage award would result in discrimination in rates among customers."); *Fax Telecommunicaciones v. AT & T,* 952 F.Supp. 946, 955 (E.D.N.Y.1996), *aff'd,* 138 F.3d 479 (under the filed rate doctrine, "claims of willful misconduct must be barred if they would require the Court to either enforce a discriminatory rate or to assess the reasonableness of a proposed rate.");[3] *MCI Corp v. Best Tel. Co., Inc,* 898 F.Supp. 868, 876 (S.D.Fla.1994) (Following *Marco* and holding that willful misconduct clause in tariff did not permit cause of action for fraudulent misrepresentation of rates); *but see American Tel. & Tel. Co. v. New York City Human Resources Admin.,* 833 F.Supp. 962, 979 n. 9 (S.D.N.Y. 1993) (stating in *dicta* that filed rate doctrine would not preclude plaintiff from bringing claim for misrepresentation of rates under willful misconduct provision of tariff). In light of the Supreme Court's decision in *Central Office Telephone,* the Court concludes that the willful misconduct clause contained in MCI's tariff does not revive Katz's claim that MCI fraudulently misrepresented *its* rates, because this claim would require the Court to enforce a discriminatory rate, and

---

3. The Second Circuit's decision in *Fax Telecommunicaciones* does not address the district court's language regarding the scope of the willful misconduct clause.

as such, is squarely barred by the filed rate doctrine.

The Second Circuit has noted that the filed rate doctrine is "plainly a creature of a different time." *Fax Telecommunicaciones,* 138 F.3d at 491. While the doctrine prevented unfair practices and price discrimination when AT & T held a monopoly in the long-distance telephone market, "strict application of the filed rate doctrine 'frustrates those same goals' in today's era of deregulation and multiple competing carriers." *Id.* (quoting *MCI Telecomms. Corp. v. American Tel. & Tel.,* 512 U.S. 218, 233, 114 S.Ct. 2223, 129 L.Ed.2d 182 (1994)). Plainly, the filed rate doctrine is a trap for today's residential telephone customer in the face of the aggressive and wide-ranging sales tactics that are symptomatic of the current highly competitive telecommunications marketplace. Indeed, the consumer has undoubtedly never heard of the doctrine. Nevertheless, the Second Circuit has made clear that "unless and until Congress or the Supreme Court re-examines the doctrine, we are bound to enforce it." *Fax Telecommunicaciones,* 138 F.3d at 491. Ratepayers, however, are free to file complaints with the proper regulatory agencies, including the FCC or the State Attorney General's Office, even if they cannot seek judicial redress for fraudulent misrepresentation. *See Wegoland,* 27 F.3d at 21. These agencies presumably would take appropriate action to curb improper sales pitches. Moreover, where appropriate, government agencies are permitted to file, and indeed have filed, suits against regulated utilities under RICO or the antitrust statutes. *Id.* at 21–22.

## CONCLUSION

For the foregoing reasons, MCI's motion to dismiss the complaint pursuant to Federal Rule 12(b)(6) is granted, and the complaint is dismissed.

**SO ORDERED.**